**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

DANIELE LEDONNE,

      Plaintiff,

v.

DR. BEVERLEE MCCLURE, in her official capacity as
President of Adams State University and in her individual capacity; and

PAUL GROHOWSKI, in his official capacity as
Chief of the Adams State University Police Department, and in his individual capacity,

      Defendants.

---

## PLAINTIFF DANIELE LEDONNE'S MOTION FOR A PRELIMINARY INJUNCTION

---

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff Daniele (Danny) Ledonne moves for a preliminary injunction prohibiting Defendants from enforcing a No Trespass Order ("Order") that bans Mr. Ledonne from the public campus of Adams State University ("ASU"). The requested preliminary injunction is essential to protect important constitutional rights, not just for Mr. Ledonne, but all Coloradoans who seek to criticize public institutions and employees without fear of state-sanctioned retribution.

## I.    INTRODUCTION

Mr. Ledonne was banned from a public college campus that is the font of intellectual inquiry and cultural expression in his home town, Alamosa. It is a place Mr. Ledonne had worked as a professor and where he had ongoing professional and community obligations as a filmmaker. Under color of state law, Defendants banned Mr. Ledonne, threatened him with arrest for trespass, and sullied his reputation, all without giving Mr. Ledonne any notice or a

meaningful opportunity to defend himself.  This they did just *two days* after Mr. Ledonne exercised his First Amendment rights by publishing on a public website embarrassing criticism of ASU's administration.  In connection with the Order, Defendants referenced mass school shootings in other jurisdictions and made numerous public statements falsely accusing Mr. Ledonne of posing a threat to the safety of the campus and its personnel.  The Order and associated false statements injured Mr. Ledonne's reputation and stigmatized Mr. Ledonne in the community.

Defendants deprived Mr. Ledonne of constitutionally-protected interests by (1) denying access to a Colorado public university campus and (2) injuring his reputation and good name. They did so without notice, without a hearing, and without any meaningful opportunity to be heard, all in violation of the Due Process Clause.  *See Watson v. Bd. of Regents of Univ. of Colo.*, 512 P.2d 1162, 1165 (Colo. 1973) (holding that ban of non-student from otherwise public Colorado university campus without a hearing violated due process); *Guttman v. Khalsa*, 669 F.3d 1101, 1125 (10th Cir. 2012) (a "stigma-plus" claim involves "(1) governmental defamation and (2) an alteration in legal status"); *McDonald v. Wise*, 769 F.3d 1202, 1213 (10th Cir. 2014) (in "stigma-plus" cases, due process requires the government to provide a name-clearing hearing, a public forum where the accused has the opportunity to rebut accusations he contends are false). Defendants should be enjoined from enforcing the Order pending a full hearing on the merits.[1]

---

[1] In this Motion, Mr. Ledonne asks for interim injunctive relief only on the basis of the Due Process Clause and the First Claim for Relief stated in the Complaint.

## II.   STATEMENT OF FACTS

### A.   Ledonne is a former ASU Professor.

1.      From May 2011 through June 2014, ASU employed Plaintiff Daniele Ledonne as an adjunct professor of video coursework in the Mass Communication program. (Verified Compl. ¶ 13.)

2.      In August 2014, Mr. Ledonne accepted a one-year position as a full-time visiting assistant professor.  He worked in that capacity until his contract with ASU ended in June 2015. (Verified Compl. ¶ 16.)

3.      Throughout his employment with ASU, Mr. Ledonne received consistently high student evaluations and "meritorious" departmental evaluations. (Verified Compl. ¶ 17.)

4.      In December 2014, Mr. Ledonne applied for a full-time, tenure track position as Assistant Professor of Mass Communication, to begin the following school year. (Verified Compl. ¶ 19.) In February 2015, Mr. Ledonne learned that he was not selected for the position. (Verified Compl. ¶ 20.)

5.      In March 2015, Mr. Ledonne filed a complaint with the ASU Office of Equal Opportunity alleging that the hiring process was flawed. (Verified Compl. ¶ 21.)

6.      In April 2015, Mr. Ledonne learned, based on conversations with then-President Dr. David Svaldi, that the contract for his teaching position would not be renewed. (Verified Compl. ¶ 23.)

7.      During the summer of 2015, after Mr. Ledonne was no longer employed by ASU, he continued to attend administrative meetings at the University as an invited presenter, serving as Vice Chair for the Contingent Faculty Instructor Council, and also as an observer. (Verified Compl. ¶ 26.)

**B.    Mr. Ledonne is a vocal public critic of ASU's administration.**

8.    Beginning in September 2015, Mr. Ledonne sought access to public records relating to compensation for Adams State faculty, staff, and administration. (Verified Compl. ¶ 27.)

9.    On September 6, 2015, Mr. Ledonne launched a website called WatchingAdams.org.  The purpose of the website was to provide access to publicly available data in order to bring to light concerns about certain practices of the ASU administration.  The website featured articles critical of the ASU administration as well as interviews with former students, faculty, and staff. (Verified Compl. ¶ 28.)

10.    At no time did Mr. Ledonne ever express any opinions or make any statements even remotely physically threatening or violent toward anyone or anything at ASU. (Verified Compl. ¶ 29.)

11.    On October 12, 2015, on WatchingAdams.org, Mr. Ledonne published three articles critical of the University.  The articles criticized the University for (1) pay disparity between staff/faculty and administration; (2) a potential violation of the Colorado Wage Act due to an ongoing practice of delayed paychecks to adjunct instructors; (3) the University's failure to respond to CORA requests within the time limits prescribed by law; and (4) a 68-day delay in fulfilling a CORA request made to the ASU's Department of Human Resources. (Verified Compl. ¶ 31.); (Ex. 1 to Compl.)

12.    The next day, on October 13, 2015, Defendant McClure informed Mr. Ledonne that he was no longer permitted to attend administrative meetings at the University. (Verified Compl. ¶ 32.)

**C.     Mr. Ledonne is banned two days after publishing critical articles.**

13.     On October 14, 2015, two days after Mr. Ledonne published the three Watching Adams articles critical of the University, Defendant Grohowski hand-delivered to Mr. Ledonne the No Trespass Order challenged in this case, signed by Defendant McClure. (Verified Compl. ¶ 33.); (Ex. 2 to Compl.)

14.     The Order states that for "an indefinite period of time," Mr. Ledonne is "prohibited from being on Adams State University property."  It further states that his "**presence on any property owned or operated by Adams State University will result in [his] immediate arrest for trespass.**"  (emphasis in original.) (Verified Compl. ¶ 34); (Ex. 2 to Compl.)

15.     The Order further states that Mr. Ledonne is prohibited from access to ASU because his "alleged behavior is deemed to be detrimental to the well-being of the institution and/or incompatible with the function of the University." (Verified Compl. ¶ 35.); (Ex. 2 to Compl.)

16.     The Order was issued summarily, without notice, without a hearing, and without any opportunity to be heard.  Mr. Ledonne was provided no information or details of the "alleged behavior" that purportedly justified the Order.  Mr. Ledonne was not provided with any advance notice that such an order was to be issued, nor was he given an opportunity to challenge or even be informed of the basis for issuing the order.  (Verified Compl. ¶ 36.)

17.     The Order includes reference to what it characterizes as an "appeal," stating, "[y]ou are also advised that you may not return to campus including any campus facilities until a decision is made to any appeal.  The appeal must be in writing and must be made within ten days of the receipt of this notice."  The Order provided the name and address of Jessica Salazar, Assistant Attorney General in the Colorado Department of Law, State Services section,

Education Unit, as the person to whom the appeal should be directed.  Mr. Ledonne contacted

Ms. Salazar, who denied that she was the appropriate person for an appeal.  Instead, Mr.

Ledonne was told he should contact Kurt Cary, the Interim Vice-President of ASU, who reports

directly to Defendant McClure. (Verified Compl. ¶ 37.)

19.    Mr. Ledonne wrote to Mr. Cary on October 27, 2015, disputing the propriety of

the Order, protesting that he was given no notice of what behaviors or conduct he was alleged to

have committed that would justify a campus ban, and disputing that he had ever been violent or

issued any statements that would express an intent to cause physical harm. (Verified Compl. ¶

38.)

19.    On November 2, 2015, Vice-President Cary responded to Mr. Ledonne and stated

that "[w]hile your e-mail does not specifically state that you intend the communication to be a

request for an appeal, I am interpreting it as such."  (Ex. 3 to Compl.)  Mr. Cary proposed that

Mr. Ledonne attend a private meeting "at a mutually agreeable off campus location."  (*Id.*) The

meeting was being "provided as [Mr. Ledonne's] opportunity to provide information relating to

[his] appeal."  (*Id.*)  After this meeting, Vice-President Cary would "review the information

presented by [Mr. Ledonne], as well as gather any additional information that [he] deem[ed]

necessary to fully review [Mr. Ledonne's] appeal."  (*Id.*)  Vice-President Cary would then notify

Mr. Ledonne of his decision to the appeal no later than ten business days after the meeting.  (*Id.*)

20.    Vice-President Cary's letter regarding the "appeal" again provided no explanation

of the evidence the University claimed to have against Mr. Ledonne.  It provided no information

or notice of any kind relating to the alleged conduct or alleged behavior that purportedly

prompted the Order banning Mr. Ledonne from campus.  On the contrary, the letter appeared to

offer Mr. Ledonne nothing more than a chance *to provide Mr. Ledonne's own information* about

charges and allegations that Mr. Ledonne knew nothing about, and to which he could not meaningfully respond. (*See* Ex. 3 to Compl.)

21.    The proposed "appeal" and the proposed meeting regarding such "appeal" did not constitute a meaningful opportunity for Mr. Ledonne to clear his name in a public forum.  (*See* Ex. 3 to Compl.)

22.    Without fair notice of the precise allegations or an explanation of the evidence against him, Mr. Ledonne could not meaningfully prepare for or participate in any postdeprivation appeal process. (Verified Compl. ¶ 40.)

23.    By summarily issuing the Order without notice and without a hearing, Defendants also violated ASU's then-existing written policy regarding conduct and behavior of non-students on campus.  This ASU policy contemplated the banning of non-students only for specifically-delineated disruptive behavior, and only ***after*** providing reasonable notice and an opportunity to be heard. (Verified Compl. ¶ 41-43.)

**D.    The Order threatens Mr. Ledonne's livelihood and denies him access to ASU cultural events.**

24.    The Order banning Mr. Ledonne from campus threatens his livelihood.  Mr. Ledonne has a video production business.  He has done video contract work with ASU.  Mr. Ledonne does video work and video projects for community organizations on a contractual basis. Many of the events he is hired to record are open-to-the-public events that take place on the ASU campus. (Verified Compl. ¶ 45.)

25.    For example, at the ASU Theater, the Mountain Valley Dance Studio performs annual spring dance recitals, as well as *The Nutcracker* ballet each December. Since 2004, Mountain Valley Dance Studio has regularly hired Mr. Ledonne to serve as the videographer for these performances. (Verified Compl. ¶ 46.)

26.    Hilos Culturales hired Mr. Ledonne to film the Hilos Culturales retreat on the ASU campus from July 19-22, 2015. Mr. Ledonne received a certificate of appreciation for this production and can reasonably expect to be involved with the organization again in the near future. (Verified Compl. ¶ 47.)

27.    Mr. Ledonne has a long-running relationship with the Southern Colorado Film Commission, which holds its annual Southern Colorado Film Festival on the ASU campus. Mr. Ledonne was unable to attend the 2015 Festival because of the Order, which was issued just one day before the Festival began. (Verified Compl. ¶ 48.)

28.    During the summer of 2016, Mr. Ledonne will be traveling to Peru on an ASU biology field study program, working as a professional videographer and photographer. Orientation meetings for this international educational program, for which Mr. Ledonne has pre-paid in full, will be taking place on the ASU campus in the succeeding months. (Verified Compl. ¶ 51.)

29.    As Mr. Ledonne has worked as a professor for many years and has many colleagues and friends at ASU, it is also vital to his ongoing professional networking in the field of higher education that he be able to attend university functions, such as lectures and cultural events, in his dual capacities as a community member and educator in his field. (Verified Compl. ¶ 53.)

30.    Beyond his professional obligations on the ASU campus, Mr. Ledonne hopes to continue to take advantage of the many cultural and artistic programs that are held on campus and are open to the public. For example, Mr. Ledonne frequently attended ASU theatre productions prior to the banishment. These productions are open to the general public, but, pursuant to the Order, Mr. Ledonne is prohibited from attending. This spring, the theatre

program is producing *Arcadia* and Mr. Ledonne would like to attend it.  Furthermore, before

Defendants issued the Order, Mr. Ledonne frequently attended concerts, faculty lectures, art

gallery openings, and cultural events which all took place on the ASU campus. (Verified Compl.

¶ 54.)  Mr. Ledonne wants to continue to attend the events in the future, which he will not be

able to do without intervention from this Court.

31.     Alamosa is in the San Luis Valley, a relatively rural and isolated region of

Colorado.  The ASU campus is the hub of intellectual and cultural life in Alamosa and the San

Luis Valley.  The campus is open to the public and the public is encouraged to attend many of

the cultural, artistic, and educational programs that occur regularly on campus.  As ASU boasts

on its own website, "As the Regional Education Provider for southern Colorado, Adams State is

crucial to enhancing the area's educational opportunity, economic development, and cultural

enrichment." (Verified Compl. ¶ 55.)

    **E.**    **In connection with the Order, Defendants made defamatory and false
stigmatizing statements about Ledonne.**

32.     In connection with the issuance of the Order, Defendants made and issued

numerous false and stigmatizing public statements about Mr. Ledonne, injuring his reputation in

the academic and professional communities and in Alamosa, generally. (Verified Compl. ¶ 57.)

33.     For example, on October 28, 2015, Defendant Grohowski issued an open letter to

"all ASU faculty and staff" in which he asserted that he made "the decision and recommendation

to disallow" Mr. Ledonne on campus.  Defendant Grohowski cited his "concern for public

safety" in relation to "Mr. Ledonne's behavior while at ASU."  Defendant Grohowski stated that

Mr. Ledonne "made numerous members of the faculty and staff uncomfortable by his actions,

words, and behaviors."  Defendant Grohowski further claimed that Mr. Ledonne "began to

harass members of the Svaldi family on social media."  (Dr. David Svaldi is the former President

of ASU, preceding Defendant McClure in the position).  Defendant Grohowski did concede that

Mr. Ledonne had violated no laws. (Verified Compl. ¶ 58.)

34.     In connection with issuance of the Order, Defendant McClure granted an

interview to the Valley Courier, the local general circulation newspaper. (Verified Compl. ¶ 59.)

In that interview, Defendant McClure made false stigmatizing statements about Mr. Ledonne,

accusing him of harassment, terrorism, and representing a threat to campus safety. (*Id.*); (Ex. 5 to

Compl.) On November 7, 2015, the Valley Courier published an article based on the interview

with Defendant McClure. (*Id.*) The Valley Courier reported as follows:

- Defendant McClure stated that over the course of the prior two years, Mr.
  Ledonne "began to harass the institution and harass the former president." (*Id.*)

- Defendant McClure stated that "[t]here were patterns of behavior that happened
  along with the creation of that website, that when we put it all together and looked
  at the timeline, targeting us and other community members . . . ." (*Id.*)

- "McClure said the university's list of instances, events, and behaviors by Ledonne
  demonstrate that he is a potential threat to campus safety." (*Id.*)

- Defendant McClure stated that Mr. Ledonne had engaged in "personal attacks"
  and "terrorism" against her, the previous president, and individuals on campus.
  (*Id.*)

35.     In a press release dated November 10, 2015, ASU asserted that the Order was

issued "only for safety purposes" and "because faculty, staff, and the former President have

expressed concerns" about what the release referred to as Mr. Ledonne's "threatening behavior."

(Verified Compl. ¶ 61.); (Ex. 7 to Compl.)

36.     On November 17, 2015, Defendant McClure issued a written statement to "ALL STUDENTS" asserting that the Order was necessary because Mr. Ledonne's "behavior include[d] direct and indirect threats against individuals and the campus as a whole." (Verified Compl. ¶ 62.); (Ex. 8 to Compl.)  Defendant McClure went on to defend her decision by citing the need to safeguard the community against the frequency of "mass violence on campuses and elsewhere." (*Id.*)

37.     On November 18, 2015, Defendant McClure called for and met with a special session of the Faculty Senate, which was open to all ASU employees. (Verified Compl. ¶ 63.) During that meeting Defendant McClure:

- Held up a thick folder of documents, giving the impression that the file she was holding contained a significant amount of evidence against Mr. Ledonne; (*Id.*)

- Stated that upon notifying the local police about the Order that was issued against Mr. Ledonne, she was informed that Mr. Ledonne was currently on a Colorado State Police "watch list." (*Id.*)

- When asked by a member of the audience if Mr. Ledonne had made threats of physical violence, Defendant McClure replied "yes." (*Id.*)

38.     Each and every one of the stigmatizing accusations detailed in paragraphs 33-37 is unfounded and false. (Verified Compl. ¶ 64.)  Defendants have refused to provide Mr. Ledonne with notice of any specific allegations that supposedly support the false defamatory accusations that Defendants have disseminated to the public. (Verified Compl. ¶ 65.)

39.     Mr. Ledonne has been stigmatized by the Order and Defendants' numerous public and widely-disseminated statements falsely accusing him of harassment, terrorism, threatening violence, and being a "threat to campus safety." As a result, his professional reputation has been

harmed and relationships with clients, potential clients, and community organizations have been damaged. (Verified Compl. ¶ 66.)

40.     On two occasions, organizations that had previously hired Mr. Ledonne to film events on the ASU campus petitioned the University to allow Mr. Ledonne on campus to film their specific events.  Permission was granted, but Mr. Ledonne was limited to specific hours and locations on the campus. (Verified Compl. ¶ 67-70.)  Mr. Ledonne's ability to access the ASU campus for specific professional obligations thus hinges on the Defendants' exercise of standardless discretion in deciding whether or not to grant permission.  On the two occasions when ASU granted permission for Mr. Ledonne to access campus on a limited basis, the University reiterated that the Order remains in effect and that if Mr. Ledonne accesses the campus during unspecified times, he will be arrested.  (Verified Compl. ¶ 68.)  Mr. Ledonne, unlike every other Coloradoan, has to ask specific permission to visit the ASU campus even for limited periods of time.  He can't visit the library, meet with his former colleagues, or attend a cultural or educational event to which the general public is invited, without specific permission, to be granted or denied at the whim of the very people who unjustifiably banned him from campus without due process.

41.     The Defendants banned Mr. Ledonne from campus without due process not because he represents an actual threat to staff, students, or property on the campus, but because he uncovered and publicized information critical of the University administration, the launching of WatchingAdams.org, and his advocacy and public statements challenging, among other things, ASU's hiring practices and academic salaries, all of which is protected expression under the First Amendment to the United States Constitution. (Verified Compl. ¶ 71.)

### III.    ARGUMENT

#### A.    Introduction

This is an easy case.  ASU's administration has barred Danny Ledonne, a long-time member of the Alamosa community and ASU administration critic, from a public university campus.  He is banned from access to what is effectively the most important cultural and intellectual attraction in the San Luis Valley.  In the course of banning him, Defendants made numerous false public statements that stigmatized him in the community and injured his professional reputation.  All this occurred without even the bare minimum of due process. Nearly 40 years ago, the Supreme Court of Colorado recognized that, in Colorado, members of the public are entitled to access the public areas of state university campuses and cannot be banned without, at the very least, a hearing in which the allegations on which a proposed ban are based could be challenged.  *See Watson*, 512 P.2d at 1165.  Additionally, in a case like this, the Constitution protects Mr. Ledonne's right to a fair and meaningful hearing to defend his reputation and good name from being falsely besmirched by Defendants' numerous publicly-disseminated defamatory statements.  *See Guttman*, 669 F.3d at 1125.

While this case has importance for Danny Ledonne, it has similar importance for the people of the State of Colorado and the constitutional principles of fairness embodied in the Due Process Clause.  Coloradoans should not be deprived of protected liberty interests, and their good names sullied by stigmatizing government accusations, without being given the right to hear what they are accused of doing, and being given an opportunity to contest the allegations.  In this case, the denial of due process is exacerbated because the stigmatizing actions were taken in retaliation for Mr. Ledonne's exercise of his First Amendment rights–his legitimate criticism of ASU's administration and hiring practices.  This Court needs to step in and make certain that Colorado citizens are not deprived of rights merely because of "discomfort" caused by criticism

leveled at public officials and organizations.  Because the Order was issued without due process, it should not be enforced.

### B.        The legal standard for issuance of preliminary injunctive relief.

To obtain preliminary injunctive relief, the plaintiff must demonstrate: (1) a substantial probability of success on the merits; (2) irreparable harm in the absence of the injunction; (3) that the threatened harm to the plaintiff outweighs the defendant's harm resulting from the injunction; and (4) that the injunction is in the public interest.  *Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1224 (10th Cir. 2009).  The probability of success factor becomes "more lenient" if the plaintiff satisfies the other three requirements.  *Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1199 (10th Cir. 1992).  In such a case, the plaintiff need only show "questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation."  *Id.*  Mr. Ledonne satisfies either test.[2]

---

[2] The proposed relief is not one of the three types of "disfavored" injunctions that require a heightened standard: "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005).  First, the proposed injunction does not alter the status quo.  Mr. Ledonne enjoyed the freedom to access ASU's campus without prior permission or threatened arrest for years until Defendants issued the Order.  Providing interim relief preserves the status quo, which is the "last uncontested status between the parties which preceded the controversy until the outcome of the final hearing." *Id.* at 1260.  Next, Mr. Ledonne's proposed injunction is prohibitory, not mandatory: it would prohibit Defendants from enforcing the Order.  Lastly, the proposed injunction would not give Mr. Ledonne all the relief he would be entitled to if he prevailed in a full trial: it would merely provide temporary protection for his constitutional rights until this Court can issue a final judgment on the merits.  *See Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1247-48 (10th Cir. 2001).

### C.  Mr. Ledonne will succeed on the merits of his claim for deprivation of procedural due process.

Two elements are needed to establish a procedural due process violation: (1) the deprivation of a liberty or property interest; and (2) constitutionally insufficient procedures followed by the State. *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).

### 1.  Defendants deprived Mr. Ledonne of a Liberty or Property Interest.

In the course of banishing Mr. Ledonne from campus, Defendants deprived him of two interests that are constitutionally protected under the Due Process Clause.  First, Colorado policy, as declared by the Colorado Supreme Court, is that "a non-student's right to access to University functions and facilities, which are open to the public at-large, cannot be permanently denied without due process of law under the Fourteenth Amendment to the United States Constitution." *Watson*, 512 P.2d at 1165. [3]

ASU is a Colorado public university.  Mr. Ledonne has a state-created constitutionally-protected interest in accessing the portions of ASU's campus that are open to the public.  Colorado has chosen to extend this benefit to members of the public and Defendants cannot now withdraw that right from Mr. Ledonne absent fundamentally fair procedures.  Defendants' Order, issued without due process, deprives Mr. Ledonne of this protected interest.

Second, Mr. Ledonne has a constitutionally-protected interest in his reputation and good name—a right not to be stigmatized by false statements.  Mr. Ledonne brings what has been called a "stigma-plus" claim.  "There are two elements of a stigma-plus claim: (1) governmental

---

[3] The Colorado Supreme Court did not address whether this constitutionally-protected interest is a *property interest* or a *liberty interest*; either way, the Supreme Court has stated that an interest that "is sufficiently embraced within Fourteenth Amendment 'liberty'" will entitle one "to those minimum procedures appropriate under the Due Process Clause to insure that the state-created right is not arbitrarily abrogated." *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974).  "This analysis as to liberty parallels the accepted due process analysis as to property." *Id.*  As such, the due process analysis remains the same regardless.

defamation and (2) an alteration in legal status." *Guttman*, 669 F.3d  at 1125.[4]  Governmental

defamation is a statement "that is sufficiently derogatory to injure [an individual's] reputation,

that is capable of being proved false, and that [the individual] asserts is false."  *See Gwinn v.*

*Awmiller*, 354 F.3d 1211, 1216 (10th Cir. 2004).  The plaintiff shows a change in legal status if

"he 'legally [cannot] do something that [he] could otherwise do.'"  *Latif v. Holder*, 28 F. Supp.

3d 1134, 1150 (D. Or. 2014) quoting *Miller v. California*, 355 F.3d 1172, 1179 (9th Cir. 2004).

First, Mr. Ledonne suffered a change in legal status.  Before the Order, Mr. Ledonne, like

all members of the general public, could enter the ASU campus.  Now, Mr. Ledonne will be

arrested if he does so today without prior permission from ASU.  Mr. Ledonne legally cannot do

something he otherwise could do.  This change in legal status meets the "plus" element of the

"stigma-plus" analysis.

Second, as detailed above in paragraphs 33-37, Defendants made numerous derogatory

statements about Mr. Ledonne, in connection with and directly relating to his being banned from

ASU's campus, that satisfy the "stigma" element of the "stigma-plus" analysis.  Moreover,

Defendants' issuance of the Order itself implies that Mr. Ledonne has violated ASU's Code of

Conduct.  ASU's Code of Conduct requires non-students to observe all laws, and, for example,

refrain from disorderly conduct, refrain from bullying, refrain from harassing behavior, and

refrain from obscene, lewd or indecent conduct.  (*See* Ex. 4 to Compl.)  When non-students

violate the Code of Conduct, that act may result in a "*Persona non grata*" order—after

---

[4] Normally, reputation alone is not an interest protected by the Due Process Clause, and thus injury to reputation is not ordinarily actionable under 42. U.S.C. § 1983.  *Paul v. Davis*, 424 U.S. 693, 712 (1976).  But when government officials injure reputation by publicly disseminating defamatory or stigmatizing false statements in connection with adversely changing a person's legal status, the requirements of the Due Process Clause apply.  *Paul*, 424 U.S. at 708-09 (alteration of legal status combined with injury from governmental defamation, required procedural safeguards of Due Process Clause ) (explaining holding of *Wisconsin v. Constantineau*, 400 U.S. 433 (1971).  Hence the term, "stigma-plus."

reasonable notice and a hearing.  (*Id.*)  The Order's strong implication, to any person learning of it, is that Mr. Ledonne has engaged in an act or acts prohibited by ASU's Code of Conduct.

Defendants' statements and the stigmatizing Order have injured Mr. Ledonne's reputation in the academic, professional, and general communities in Alamosa.  Defendants publicly branded Mr. Ledonne as a potentially violent person who engages in terrorism and threatening violence. The elements of the "stigma-plus" doctrine are met, which means the government has deprived Mr. Ledonne of "a liberty interest that triggers procedural due process protection."  *Brown v. Montoya*, 662 F.3d 1152, 1167 (10th Cir. 2011).  As discussed below, Defendants deprived Mr. Ledonne of one of the most critical components of the protections Due Process affords in a case such as this: a name-clearing hearing that provides an opportunity to contest the veracity of the accusations.  *See McDonald*, 769 F.3d at 1213.

### 2.    Defendants Afforded Plaintiff Insufficient Process.

### a.    The lack of pre-deprivation process.

"Once it is determined that due process applies, the question remains what process is due." *Goss v. Lopez*, 419 U.S. 565, 577 (1975).  The Colorado Supreme Court confronted this precise issue.  In *Watson*, a failed applicant to the University of Colorado allegedly threatened a member of the admissions committee. *Watson*, 512 P.2d at 1163-64.  Without giving the individual a hearing, the University of Colorado barred him from campus and threatened him with arrest.  *Id.* at 1164.  The Court held: "Where students have been subjected to disciplinary action by University officials, courts have recognized that procedural due process requires–*prior to imposition of the disciplinary action*–adequate notice of the charges, reasonable opportunity to prepare to meet the charges, an orderly administrative hearing adapted to the nature of the case, and a fair and impartial decision."  *Id.* at 1165 (emphasis added).  "The *same protections* must be

afforded non-students who may be permanently denied access to University functions and facilities." *Id.* (emphasis added).

For a hearing to be meaningful there must be fair notice of the allegations.  "In being given an opportunity to explain his version of the facts," a person should "be told what he is accused of doing and what the basis of the accusation is."  *Goss*, 419 U.S. at 582.

Here, Defendants provided Mr. Ledonne with no process prior to issuing the Order.  The Order was issued without notice, without a hearing, and without a meaningful opportunity to respond to the accusations.

### b.      The lack of post-deprivation process.

In some rare situations, a post-deprivation hearing can satisfy due process requirements. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 n.7 (1985).  As the Supreme Court has explained: "An important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation." *Gilbert v. Homar*, 520 U.S. 924, 930-31 (1997) quoting *FDIC v. Mallen*, 486 U.S. 230, 240 (1988)).

The Colorado Supreme Court in *Watson* itself recognized this possibility: "When a *genuine emergency* appears to exist and it is impractical for University officials to grant a prior hearing, the right of non-students to access the University may be suspended without a prior hearing, so long as a hearing is thereafter provided with reasonable promptness." *Watson*, 512 P.2d at 1165 (emphasis added).

But this was not a situation in which the Constitution allowed Defendants to dispense with pre-deprivation procedures.  In Mr. Ledonne's case, no emergency existed prior to issuing

the Order.  No laws had been violated.  Defendants had no reason to act so quickly, and the

University could have easily provided pre-deprivation process–as anticipated by its own Code of

Conduct.  It cannot be "impractical" for the University to abide by its own policies and

procedures.

Certainly ASU has an important interest in maintaining a safe campus environment.  But

that interest was not accompanied, as case law requires, by a substantial assurance that Mr.

Ledonne's constitutional rights were not being baselessly compromised.  *Gilbert*, 520 U.S. at

930-31.  This is not an unusual case (such as the threat of imminent bodily harm) that demanded

immediate prompt action justifying the denial of pre-deprivation due process.

And even if some genuine emergency had existed that would have permitted Defendants

to dispense with predeprivation process (and it did not), Defendants still failed to provide Mr.

Ledonne with meaningful postdeprivation process that satisfies the Due Process Clause.  "The

essence of due process is the requirement that 'a person in jeopardy of serious loss [be given]

notice of the case against him and opportunity to meet it.'"  *Mathews*, 424 U.S. at 348 quoting

*Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 171-72 (1951); *accord Sepulvado v. Jindal*,

739 F.3d 716, 721 (5th Cir. 2013).  Due process requires notice "to apprise interested parties of

the pendency of the action and afford them an opportunity to present their objections."  *Mullane*

*v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *accord U.S. v. Cervantes*, 795

F.3d 1189, 1190 (10th Cir. 2015).  It must "permit adequate preparation for, an impending

'hearing.'"  *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 14 (1978); *see also Vitek v.*

*Jones*, 445 U.S. 480, 496 (1980) ("notice is essential to afford the [plaintiff] an opportunity to

challenge the contemplated action and to understand the nature of what is happening to him").

"Without knowledge of a charge, even simple factual errors may go uncorrected despite

potentially easy, ready, and persuasive explanations." *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 982 (9th Cir. 2011).

Here, the only arguable process the University offered was a suggestion that Mr. Ledonne could invoke what the Order called an "appeal," which Vice-President Cary referenced in his correspondence with Mr. Ledonne. But Mr. Ledonne's opportunity for a postdeprivation "appeal" was meaningless and constitutionally inadequate for two primary reasons.

First, Defendants *never* told Mr. Ledonne what he is accused of doing or the evidence on which the allegations were based. Given this, Mr. Ledonne could not meaningfully respond to Defendants' vague and general allegations that he posed some kind of danger.

Second, the postdeprivation "appeal" was inadequate because when an individual's liberty interest is infringed upon, as is the case here under the "stigma-plus" doctrine, "he must receive an adequate name-clearing hearing." *See McDonald*, 769 F.3d at 1213. "A name-clearing hearing 'gives the plaintiff an opportunity to hear and answer firsthand any stigmatizing charges, clearing his name of any false statements made about him, and curing the injury to his reputation.'" *Id.* quoting *Patterson v. City of Utica*, 370 F.3d 322, 335 (2d Cir. 2004). The Tenth Circuit has emphasized that a "proper name-clearing hearing" provides the individual "with a *public forum* to clear his name before the governing body that discharged him.'" *Id.* at 1214 quoting *Rosenstein v. City of Dallas, Texas*, 876 F.2d 392, 396 (5th Cir. 1989) (emphasis added).

In this case, Defendants neither provided nor offered any public forum where Mr. Ledonne could have had an opportunity to meet the (undisclosed) accusations, rebut them, and clear his name. The Vice-President's proposed private meeting was to take place off-campus and was certainly no opportunity for Mr. Ledonne to clear his name in a public forum. This

post-deprivation "appeal" would not have provided Mr. Ledonne a public forum where he would have the opportunity to hear and answer firsthand the stigmatizing statements to clear his name. As such, the process given to Mr. Ledonne–either pre or postdeprivation–was constitutionally insufficient.

**D.      Plaintiff has demonstrated a substantial likelihood of success on the merits.**

Mr. Ledonne has shown a substantial likelihood of success on the merits of his Due Process claim.  As discussed below, Mr. Ledonne also satisfies the other three requirements for a preliminary injunction.  Accordingly, to establish the likelihood-of-success element, he need only show questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation. *Resolution Trust Corp.,* 972 F.2d at 1199.  Mr. Ledonne has certainly met and exceeded that legal test.

**E.      Plaintiff is suffering irreparable harm that will continue unless the preliminary injunction is granted.**

"A plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001).  "'When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.'" *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) quoting 11 Charles Alan Wright et al., Federal Practice and Procedure § 2948.1 (2d ed. 1995); *see also Beerheide v. Zavaras*, 997 F. Supp. 1405, 1410 (D. Colo. 1998).

Plaintiff demonstrated that his constitutional right to due process was violated; thus "no further showing of irreparable injury is necessary." *Kikumura*, 242 F.3d at 963.  Moreover, because injury to Mr. Ledonne's reputation cannot be easily measured in monetary terms, it constitutes irreparable harm that warrants injunctive relief. *See Dominion*, 269 F.3d at 1156-57

(affirming district court's finding of irreparable harm for, among other things, "loss of reputation" because "no remedy could repair the damage to [Plaintiff's] reputation and credibility"); *see also Kroupa v. Nielsen*, 731 F.3d 813, 820 (8th Cir. 2013) ("Because damage to one's reputation is a harm that cannot be remedied by a later award of money damages, the threat of reputational harm may form the basis for preliminary injunctive relief.").

Defendants' actions in granting permission to Mr. Ledonne to access the ASU campus for two previous professional obligations in no way mitigates or reduces the irreparable harm that the Order causes Mr. Ledonne.  Mr. Ledonne is still tainted and stigmatized by the notion that he, or the organizations with which he works, must ask the University's permission, subject to no criteria or guidelines that must be followed, objective or otherwise.

In addition, the Order is violating Mr. Ledonne's First Amendment right to receive information and ideas.  "The Supreme Court has repeatedly recognized that the First Amendment includes not just a right of free speech, but also a right to receive information." *Doe v. City of Albuquerque*, 667 F.3d 1111, 1118 (10th Cir. 2012).  This First Amendment right has been recognized in a variety of contexts.  *See, e.g.*, *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1255 (3d Cir. 1992) (right to receive information includes "some level of access to a public library"); *Willis v. Town of Marshall, N.C.*, 426 F.3d 251, 260 (4th Cir. 2005) (right to receive information includes listening to musical performances at town community center).

The First Amendment right to receive information and ideas protects Mr. Ledonne's right to attend concerts, lectures, and other cultural events that take place on the ASU campus and that are open to members of the general public.  The Order infringes on Mr. Ledonne's First Amendment rights.  The Supreme Court and the Tenth Circuit have long recognized that "loss of

First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1235 (10th Cir. 2005).

**F.     The threatened injury to plaintiff outweighs the harm to defendants resulting from the injunction.**

The balance of hardships unquestionably favors Mr. Ledonne.  Mr. Ledonne is suffering irreparable injury from the damage to his reputation and the continuing prohibitions of the Order. No harm will result to Defendants if the preliminary injunction is granted.  Indeed, Defendants' own conduct demonstrates this fact by allowing Mr. Ledonne, on two separate occasions, limited unsupervised access to the ASU campus to film specific events.  Moreover, Defendants cannot complain that they will be harmed by being required to comply with their own policies and procedures as published in the ASU Student Handbook. (*See* Ex. 4 to Compl.)

Furthermore, no additional burden is placed on the University.  If Defendants truly believe that Mr. Ledonne is a threat or danger to the ASU campus, then they need to comply with due process and give him appropriate notice of what he is alleged to have done and a fair hearing, before banning him and publicly branding him a terrorist and potential mass murderer. Mr. Ledonne's threatened–and already experienced–injury outweighs any speculative harm to Defendants.

**G.     A preliminary injunction would not be adverse to public interest.**

The preliminary injunction is not adverse to the public interest; on the contrary, the public interest is served by enforcing the Constitution and enjoining the state's action when it is not in accordance with due process of law.  *See Chamber of Commerce v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010) ("Oklahoma does not have an interest in enforcing a law that is likely constitutionally infirm.").  "[I]t is always in the public interest to prevent a violation of a party's

constitutional rights." *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) (internal quotation marks omitted).  Also, the public interest is not served by allowing Defendants to *disregard their own policies* by barring members of the public without fair notice and an opportunity to be heard on the matter.

## IV.    NO SECURITY SHOULD BE REQUIRED

Trial courts have "wide discretion under Rule 65(c) in determining whether to require security," *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009) (internal quotation marks omitted), and may require security in appropriate cases.  *See, e.g., Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003) (no bond necessary where there was no showing of harm from injunction); *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (no bond necessary where plaintiff had strong likelihood of success on merits).

In this case, Mr. Ledonne has demonstrated a substantial likelihood of success on the merits, and Defendants will suffer no harm from a preliminary injunction.  Accordingly, no security should be required.

## V.    CONCLUSION

For the foregoing reasons, all four factors weigh in favor of the injunction.  Plaintiff Ledonne respectfully requests that this Court issue an order enjoining Defendants from enforcing the No Trespass Order pending a final judgment in this action.

Dated: February 10, 2016.                    Respectfully submitted,


                                             *s/ N. Reid Neureiter*
                                             N. Reid Neureiter
                                             Kayla Scroggins
                                             Wheeler Trigg O'Donnell LLP
                                             370 Seventeenth Street, Suite 4500
                                             Denver, CO 80202-5647
                                             Telephone:   303.244.1800
                                             Facsimile:   303.244.1879
                                             Email:   neureiter@wtotrial.com
                                                      scroggins@wtotrial.com

                                             Mark Silverstein
                                             Sara R. Neel
                                             AMERICAN CIVIL LIBERTIES UNION
                                             FOUNDATION OF COLORADO
                                             303 E. 17th Avenue, Suite 350
                                             Denver, CO 80203
                                             Telephone:   720.402.3114
                                             Email: msilverstein@aclu-co.org
                                                      sneel@aclu-co.org

                                             *Attorneys for Plaintiff Daniele Ledonne*